**UNITED STATES, Appellee,**

v.

**Susan JOYNER, Defendant, Appellant.**

No. 98–1545.

United States Court of Appeals, First Circuit.

Heard Aug. 2, 1999.

Decided Sept. 8, 1999.

Paul J. Garrity, by appointment of the Court, for appellant.

Jean B. Weld, Assistant United States Attorney, with whom Paul M. Gagnon, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge, HILL,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Chief Judge.

Susan Joyner ("Joyner") appeals from her conviction on one count of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846. She argues that in closing arguments, over her contempo-

* Of the Eleventh Circuit, sitting by designation.

raneous objection, the government propounded facts not in evidence concerning a green knapsack and the search of a co-conspirator's house. Joyner also alleges that the government, without her contemporaneous objection, vouched for the credibility of co-conspirators and placed in issue the government's credibility. The government agrees that the prosecutor erred, but moved for summary disposition. While finding the prosecutor's conduct during closing arguments unfortunate, we affirm Joyner's conviction for the reasons stated below.

## BACKGROUND

The government offered evidence from which the jury could reasonably have found the following facts. Since at least 1989, a cocaine distribution ring was operated by Josian Báez, a fugitive defendant in this case, in Lawrence, Massachusetts. In January 1993, José Raphael Sánchez, also a fugitive defendant, became part of the enterprise. Several of Joyner's co-defendants, Kelly Charest and Haven Layne, and unindicted co-conspirator Bryan Blake purchased cocaine from Báez and Sánchez.

In May 1994, the New Hampshire Drug Task Force ("NHDTF") began investigating reported cocaine trafficking activities by co-defendant Barbara Oliver in the Seacoast region of New Hampshire. Oliver, who lived in Dover, NH, and co-defendant Pamela Harris regularly purchased one ounce quantities of cocaine from a source in Dover for several months in late 1993 and early 1994. In February 1994, an arrest brought an end to this supply. Oliver began dating co-defendant Bryan Blake. Following his arrest in June 1994, Blake introduced Oliver to his Massachusetts sources, after which Oliver traveled to Lawrence two to three times weekly to obtain cocaine. Sánchez and Báez employed Juan Bautista Bonifacio as a courier to meet Oliver with the cocaine. In September 1994, a confidential informant told the NHDTF that Pamela Harris was

involved with Oliver, and that it had purchased cocaine from both Oliver and Harris.

In January 1995, law enforcement officials received community complaints from residents of the Dover Housing Authority of numerous people coming and going, with probable drug activity, at 3 Hampshire Circle (Oliver's residence) and 399 Washington Street (Harris's residence). On January 5, 1995, a search warrant was executed at 399 Washington Street, Dover, with 5.88 grams of cocaine seized. Harris was arrested and convicted in Strafford County Superior Court. However, she continued to make trips to Lawrence with Oliver to purchase four to six ounces of cocaine per week. In April 1995, Oliver moved to 6 Linda Avenue, Dover, and met the appellant, Susan Joyner, who began accompanying Oliver or Harris to pick up cocaine at least two times per week.

In February 1996, Drug Enforcement Administration ("DEA") agents interviewed another confidential informant, who stated that Oliver was still buying cocaine from Dominicans in Lawrence. In April 1996, another confidential source indicated that Oliver was supplying cocaine to the bartenders at My Brother's Place in Somersworth, which she managed. During April and May 1996, this informant made several controlled cocaine "buys" at My Brother's Place and from Oliver at her new residence at 7 Ham Street, Dover.

Oliver paid Harris and Joyner with either an ounce of cocaine at cost ($550), or credit to their drug debts for picking up the cocaine. Between October 1996, and February 1997, Joyner and Harris purchased ten to fourteen ounces of cocaine weekly for Oliver. Beginning in late December, Karen Burton, who is Joyner's sister, began to travel with Joyner, picking up ten to twenty ounces per week throughout the spring of 1997. Oliver called the Lawrence source and placed the drug order. She then informed Joyner or Burton of the location where they would make the pickup. Oliver also instructed Joyner or

Burton where to meet her beforehand to receive the drug purchase money. The two sisters, Joyner and Burton, drove in Joyner's vehicle, a white convertible, to Lawrence to pick up the cocaine. The drugs were stored temporarily at Joyner's or Harris's residence, or at a local hotel, and then picked up by Oliver.

On April 9, 1997, unindicted co-conspirator Brenda Brault, who was housesitting for Barbara Oliver while she visited her son in Pennsylvania, paged Pamela Harris. Brault told Harris that Oliver wanted her to call Massachusetts to arrange for a cocaine pickup. Harris arranged the pickup, collected the purchase money from Brault and provided it to Joyner, who traveled with Burton to Massachusetts. They purchased nineteen or twenty ounces of cocaine. Later that same day, Oliver phoned Harris and asked her to pick up the cocaine from Joyner and Burton. Harris placed the newly purchased cocaine in a toolbox which belonged to Barbara Oliver, and which already contained approximately two ounces of cocaine. The toolbox was stored in a closet in Harris's bedroom.

The next day, law enforcement officials obtained a search warrant for Harris's apartment and seized approximately 580 grams of cocaine, $780 in U.S. currency, a safe-deposit box key, an Ohaus triple beam scale, a Tanita digital scale, and a bottle of inositol. Harris agreed to cooperate by placing a call to Oliver, who had returned that day from Pennsylvania. During the call, Harris, under the supervision of law enforcement officials, used the ruse that her probation officers were coming to visit and she needed to have "the box" picked up right away. Daniel Nolin, Oliver's boyfriend, arrived at Harris's apartment and told the officers, who posed as Harris's probation officers, that he wanted to retrieve his toolbox. When the officers refused to hand over the toolbox, Nolin left.

Later the same day, Harris placed another recorded call to Oliver, who speculated that Harris's probation officers may

have come because Harris had been to "Sue's" (Joyner's) house or "Karen's" (Burton's) house the previous day. Oliver told Harris to destroy the cocaine and throw the scales away, since she was concerned the probation officers would return with a search warrant. Harris also placed a recorded call to Burton, who said that she too had "cleaned" her apartment. Harris related to officers that Oliver often asked her to store the cocaine at her residence since both Joyner and Burton were heavy cocaine addicts. Oliver was arrested in the evening of April 10, 1997, and during a search of her house, officers found a drug ledger which included a reference to "Sue & Karen—1 ½ back." Based upon the evidence elicited, Joyner was assessed with responsibility for distributing a total of 5.1 kilograms of cocaine during the course of the conspiracy.

Seven co-conspirators of Joyner's testified at her trial. Pamela Harris identified Joyner, whom she knew as "Sue," as one of Barbara Oliver's regular drug runners, along with her sister Karen Burton. According to Harris, the day prior to Oliver's arrest on April 10, 1997, Oliver paged her and requested that she collect some cocaine which Joyner and Burton had purchased earlier in the day. Brenda Brault, who also testified at Joyner's trial, and Harris both stated that, during the morning of the same day (April 9, 1997), Oliver arranged for Brault to bring Harris a bag containing $10,000 in U.S. currency, which Harris then delivered to Sue Joyner on the street in her home town of Rollinsford, New Hampshire. The bag which contained the $10,000 was a green knapsack that belonged to one of Brault's children. Brault had collected the $10,000 from prior sales of fifteen to twenty ounces of cocaine.

Harris further testified that, at Brault's request, she placed a call to the drug source in Massachusetts, whose number she had previously received from Oliver. The source wanted the usual runners, Joyner and Burton, to come that morning for the purchase. Later that day, Harris

picked up the cocaine from Burton's house. Oliver had called Harris and asked her to collect the cocaine from Joyner; however, when Harris called "Sue," she told her that Karen had the drugs because Joyner's husband was at home. Harris then retrieved the nineteen ounces of cocaine, contained in a blue Wal–Mart bag, from Burton and brought it to her own residence, where she stored it in Barbara Oliver's toolbox, which was in her closet.

Harris also described the various monitored and taped telephone conversations she had with Karen Burton and Barbara Oliver on April 10, 1997, once law enforcement officials executed the search warrant at her residence. Oliver speculated as to why Harris's probation officers (part of the cooperation ruse) may have visited her, saying that it may have been because she went to Sue's or Karen's house the day before. Harris said that Oliver was referring to Sue Joyner and Karen Burton. Harris also confirmed that she had dealt cocaine with Barbara Oliver since 1993, often traveling with her to pick up the drugs. After Harris was arrested in January 1995, she stopped the cocaine business for a short time. However, she eventually went back to transporting cocaine for Oliver. Susan Joyner became a courier along with her. Subsequently, Joyner and Karen Burton became the primary runners. On many occasions from 1995 through 1997, Harris was at Oliver's house when Joyner stopped by for the money to purchase cocaine in Massachusetts. Harris identified photographs of Joyner's vehicle (a white convertible), which was used for the Massachusetts trips, and Joyner's residence, where Harris stopped by "seven or eight" times to pick up cocaine for Oliver.

Brault also identified Joyner as someone she knew to have been a regular drug runner for Barbara Oliver. Oliver told Brault that she would often collect the cocaine from Joyner's house. Before traveling to Pennsylvania, Oliver dropped off fifteen to twenty ounces of cocaine for Brault to sell while she was out of town.

She also told Brault that she was having Burton and Joyner drive to Massachusetts to pick up another twenty ounce purchase for $10,000 while she was gone. Brault spoke with Joyner directly on the telephone on April 9, 1997, to discuss the plans—that Harris would bring the money to "Sue's" house, that she would drive down for the purchase, and that they "would hook up after, when they came back." She also spoke with Joyner after the purchase was made. Brault observed Joyner stop by Oliver's house three or four times to drop off cocaine which she had just picked up.

Another convicted co-defendant, Kelly Charest, identified Joyner in court as a runner for Barbara Oliver. Charest observed Joyner at Oliver's house twice in April 1997, picking up money in order to make drug runs to Massachusetts. Christine Holland, an unindicted co-conspirator, testified that she accompanied Oliver to Joyner's house to pick up cocaine several times. Holland and several others she knew purchased cocaine from Joyner directly on several occasions.

Daniel Nolin, Oliver's boyfriend who was also a convicted co-conspirator, identified Joyner as being involved in the cocaine conspiracy. He also described having seen Joyner cutting cocaine with Oliver. Nolin also brought a package of cash on one occasion, at Oliver's request, to Joyner at her place of employment, the Wal–Mart hair salon in Somersworth, New Hampshire. Nolin also identified Joyner's residence, stating that he had picked up half-pound quantities of cocaine there for Oliver.

Barbara Oliver testified as to the breadth and membership of the cocaine operation she had run for several years. According to Oliver, during the two years Joyner worked for her, she acted as her drug courier more steadily than any runner she had employed. Joyner was selling an ounce at a time to her own customers. Oliver allowed her simply to buy her own ounce at cost in return for making the

drug trips. She described the general mode of operation utilized by Joyner and her sister, Karen Burton, to make the drug runs. Generally, Joyner would leave the cocaine for Oliver to pick up from either her car or her house. Oliver also described the events of April 9, 1997, in a similar fashion to the testimony given by Harris and Brault.

Finally, Juan Bautista Bonifacio, one of the sources of supply in Lawrence, identified Joyner as the person who regularly picked up cocaine from him in April 1997, right before he was arrested. Bonifacio testified that Joyner came at least once a week, along with another thin, blond woman, like herself. Joyner had also traveled with "Barbara" to get the drugs on many occasions.

Detective Sergeant Steven Demo, with the NHDTF, testified to having recovered, during the search of Harris's home on April 10, 1997, a piece of paper containing phone numbers, which was discovered inside the false bottom of a book. Contained on the sheet was the phone number of the hotel at which Barbara Oliver was staying in Pennsylvania, and phone numbers linked to Karen Burton and Susan Joyner. Demo also testified to discovering one call from Susan Joyner to Barbara Oliver's caller ID on April 10, 1997. Demo also confirmed that the child's knapsack which Brault gave to Harris with the money, and which Harris gave to Joyner, was found in Harris's bedroom closet during the search, where the toolbox was located.

In her summation, the prosecutor noted all the ways in which the co-conspirators' accounts of their dealings with Susan Joyner corroborated each other. Particularly, she described the points on which Brault, Harris, Charest, Oliver, Nolin and Bonifacio were on all fours with regard to the events which occurred on April 9, 1997. The prosecutor also recounted the items of independently corroborating physical evidence, including the drug ledger, personal phone book and phone number list seized from Harris, the various telephone calls from Oliver and calls to the sources of supply, calls to beepers, and the taped telephone conversations which Harris made to Oliver and Burton.

During his closing, defense counsel attempted to show that each of the co-conspirator witnesses had lied. Specifically, he attempted to demonstrate that Harris lied, and that she was actually the person who traveled to Massachusetts to purchase the cocaine found in her closet on April 10, by arguing that her testimony that she gave the child's knapsack full of money to Joyner for the drugs was belied by the fact that police found the knapsack in her own closet the next day. He also argued that because Sergeant Demo's report had not initially listed Joyner's phone number on the scrap of paper he retrieved from Harris's residence, that Harris or someone must have doctored the paper by later adding Joyner's first name and telephone number.

In rebuttal, the prosecutor responded to defense counsel's assertion that someone, perhaps someone in law enforcement, had doctored the paper with phone numbers by calling such an allegation "absurd." She argued:

> What, do you think that we had Pam Harris—oh no, we don't have enough evidence against Susan Joyner. Hey, Pam—wink, wink nod, nod—write her number down here? That's absurd. This piece of evidence was seized from Pam Harris' residence. The numbers appeared on it, the numbers stayed on it. No number was added.

In response to the allegation that all the witnesses were lying, the prosecutor stated:

> I don't want to keep flipping through these pages and showing you this. She [Barbara Oliver] didn't want to insulate herself. She is dead in the water. These are her telephone toll records. Look at them. Barbara Oliver told the truth. Everyone told the truth in this case, ladies and gentlemen.

Finally, the prosecutor responded to the allegation that the discovery of the child's knapsack in Harris's closet proved that she lied about the events of April 9, 1997, as follows:

> She [Harris] gives Sue the money, Sue brings the money down to Lawrence, the drugs are put in this bag and brought back. [Objection interposed, district court instructs jurors their recollection should prevail.] What Pam Harris testified to, and it is only your recollection of the evidence, only, what Pam Harris testified to was that the cocaine she received back from Karen Burton came in this bag. And if you don't recollect that—[Same objection. The court again instructs jurors that their recollection prevails.]

The jury found Joyner guilty on one count of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846. The district court sentenced her to ninety-seven months imprisonment and five years supervised release.

Joyner filed a post-trial motion to set aside the verdict based upon the ground raised in this appeal, an improper closing argument by the prosecutor, and the motion was summarily denied.

## DISCUSSION

### I. Improper Evidentiary Argument

■ Joyner argues that the prosecutor, by asserting that the green knapsack was found in Harris's residence because Burton had given the cocaine to Harris in that knapsack, asserted facts that, according to all the evidence, were simply not true. Joyner contends that the prosecutor's conduct is "all the more egregious because, when questioning Harris, she had explicitly referred to the cocaine being in a blue Wal–Mart plastic bag, *not* in a child knapsack." Appellant's Br. at 18.

■ Because counsel timely objected to this line of argument, we review for

harmless error, that is, whether the argument was "sufficiently prejudicial to warrant a new trial under the circumstances." *United States v. Rosales,* 19 F.3d 763, 767 (1st Cir.1994). In determining whether the prosecutor's remarks were harmless, we consider

> a range of factors starting with the nature of the (mis)conduct and ending with the unavoidable bottom line: whether we deem it likely, or not, that any prejudice affected the outcome of the case. In conducting this analysis, we evaluate the prosecutor's comments as a whole, not in isolation.

*Id.* (quotation marks and citation omitted).

Our analysis begins with an examination of the prosecutor's rebuttal:

> **Prosecutor**: [Attorney Garrity made a big deal about how Pam Harris lied.] [B]ring the money to [Joyner] in this knapsack, because it was found in her closet at her house. She gives [Joyner] the money, [Joyner] brings the money down to Lawrence, the drugs are put in this bag[1] and brought back.
>
> **Appellant**: There's no evidence of that.
>
> **Court**: Members of the jury, you will take your own recollection of the evidence and not what either counsel has told you the evidence is.
>
> **Prosecutor**: What Pam Harris testified to, and it is only your recollection of the evidence, only, what Pam Harris testified to was that the cocaine she received back from Karen Burton came in this bag. And if you don't recollect that—
>
> **Appellant**: There's no evidence of that, your Honor.
>
> **Prosecutor**: It is your recollection.
>
> **Court**: Members of the jury, it's your recollection once again that will control, not what counsel says. So don't repeat the statement. It's not a contest.

After closing arguments, the court instructed the jury that arguments of counsel were not evidence, the jury's recollec-

1. The government concedes that the reference here is to the knapsack.

tion of the evidence controlled and any statement of counsel conflicting with its recollection should be ignored.

A review of Harris's testimony confirms that the prosecutor, in arguing "what Pam Harris testified to was that the cocaine she received back from Karen Burton came in [the green knapsack]," misstated the trial testimony. Harris actually testified that the cocaine was returned to her in a blue plastic Wal–Mart bag. While this remark misstated Harris's testimony, Joyner's contention notwithstanding, there is no indication that the remark was a knowing misrepresentation of the evidence. Such a negligent misrecollection, while still inappropriate, is less serious than intentionally arguing facts not in evidence.

■ This Court has fashioned a three prong test for examining whether the prosecution's misconduct "so poisoned the well" that the trial's outcome was likely affected, thus warranting a new trial. *See United States v. Capone,* 683 F.2d 582, 586–87 (1st Cir.1982). We examine: (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case. *See United States v. Hodge–Balwing,* 952 F.2d 607, 610 (1st Cir.1991).

First, the prosecutor's comments regarding the child's green knapsack were isolated, and occurred only twice during her rebuttal. Contrary to Joyner's allegation, the misstatement does not appear to be a deliberate misrecollection. Second, the district court quickly and adequately addressed the situation with cautionary instructions during the prosecutor's rebuttal, and told government counsel to move on. The jurors were left with a situation in which government counsel said that Harris testified a certain way, and defense counsel's clear assertion that she did not. After closing arguments, the court instructed the jury: (1) that arguments of counsel were not evidence; (2) that the jury's recollection of the evidence controlled; and (3) that any statement of counsel conflicting with its recollection should be ignored. Finally, the overwhelming evidence of Joyner's guilt, including testimony by seven co-conspirators, which was corroborated by documentary evidence, eliminates any lingering doubt that the remarks could have unfairly prejudiced the jury's deliberations.

Returning to the "unavoidable bottom line" test of *Rosales*—whether we deem it likely, or not, that any prejudice affected the outcome of the case—we conclude that the errors did not affect the trial's outcome. The prosecutor's errors are minor given the testimonial evidence. The unexplained presence of the knapsack at Harris's residence was not particularly probative. The jury was quite likely to infer that the blue Wal–Mart bag was returned to Harris in the green knapsack without the government's erroneous rebuttal remarks. Joyner has not shown anywhere near enough evidence to prove that the argument was sufficiently prejudicial to warrant a new trial under the circumstances.

## II. Vouching

■ Joyner also argues that the prosecutor disregarded the well established rule against vouching in both summation and rebuttal by repeatedly assuring the jury that government witnesses were truthful and placing the credibility of her position at issue. Because counsel failed to make a contemporaneous objection, we review for "plain error." *See United States v. Roberts,* 119 F.3d 1006, 1014 (1st Cir.1997). Joyner faces a high hurdle in this regard, because our review under the plain error standard is ordinarily limited to "blockbusters" and does not consider "the ordinary backfires—whether or not harmful to a litigant's cause—which may mar a trial record." *Id.* In order to prevail, Joyner must demonstrate that the error is

plain, and undermines the fundamental fairness of the trial. *See id.*

With that said, there is no denying that the prosecutor stepped over the proverbial line with her statements. When a prosecutor places the credibility of counsel at issue, the advantage lies solidly with the government, and thus, prosecutors are prohibited from doing so. *See United States v. Cresta*, 825 F.2d 538, 555 (1st Cir.1987); *see also United States v. Nickens*, 955 F.2d 112, 121 (1st Cir.1992); *United States v. Rodriguez–Estrada*, 877 F.2d 153, 158 (1st Cir.1989) (same). Even the government admits that the prosecutor acted inappropriately.

In its brief, the government concedes that: (1) comments during the prosecutor's summation—that the witnesses were telling the truth—were improper; (2) the prosecutor's statements that the government does not just "round up as many people as we possibly can to point the finger at Susan Joyner and just run in here and expect you to buy it" could also have been more artfully presented; (3) the prosecutor's comments about witnesses telling the truth in rebuttal "again inartfully stepped over the witness-vouching line"; and (4) the interjection of her personal life and the government's efforts into the trial were improper. While some of her remarks came at the provocation of defense counsel, and thus while still inexcusable are understandable, others did not. There should be no need to remind federal prosecutors that they are not free to disregard the bounds of proper argument even in response to perceived provocation. *See United States v. Young*, 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

Under the "plain error" standard, Joyner bears the burden of showing that the prosecutor's remarks resulted in prejudice, *i.e.*, affected her substantial rights. *See United States v. Olano*, 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Even then, however, we will not notice error unless it caused "a miscarriage of justice" or seriously undermined "the integrity or public reputation of judicial proceedings." *Id.* We must consider the likely impact the prosecutor's remarks had on the jury in light of the entire record, including the closing argument presented by the defense. *See Young*, 470 U.S. at 16–17, 105 S.Ct. 1038.

Given that Joyner's counsel accused either the government or a government witness of altering a piece of physical evidence, and challenged the investigator's decision not to have Pamela Harris place a monitored phone call to Susan Joyner, as well as Oliver and Burton, the prosecutor's rebuttal was understandable, albeit still inappropriate. *See United States v. Oreto*, 37 F.3d 739, 746 (1st Cir.1994) (tolerating measured response to repeated attempts to magnify government misconduct). Given the overwhelming evidence against Joyner, *see supra*, and the provocative excesses in the closing argument presented by her own counsel, as well as the timely jury instructions by the district court, the improper remarks by the prosecutor in her closing arguments did not rise to the level of plain error.

### CONCLUSION

For the reasons stated above, we **affirm**.