# United States Court of Appeals
## For the First Circuit

No. 09-1431

UNITED STATES OF AMERICA,

Appellee,

v.

LEROY GENTLES,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Howard, Selya, and Thompson,
Circuit Judges.

Robert Herrick for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D.
Silsby, United States Attorney, was on brief, for appellee.

September 2, 2010

**THOMPSON, Circuit Judge.** Defendant Leroy Gentles (Gentles) was convicted on four counts of distributing crack cocaine in Maine. He was sentenced to sixty-four months' imprisonment, followed by four years' supervised release, with a special condition of substance abuse treatment counseling. On appeal, Gentles argues that (1) the district court abused its discretion in denying his motion for a mistrial based on "repeated improprieties" in the government's closing argument; (2) the prosecutor improperly vouched for the government's witnesses, depriving him of a fair trial; (3) the admission of prior bad acts evidence deprived him of a fair trial; and (4) his sentence was unreasonable. For the reasons that follow, we affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

In the spring of 2006, James Bellino (Bellino), a former crack addict, contacted agents of the Drug Enforcement Administration (DEA) and thereafter became a paid confidential informant (CI). Bellino testified at trial that he was motivated by the desire "to do the right thing and straighten [his] life around."

On May 16, 2006, Bellino informed the DEA about a man, known on the streets as "Junior," who was selling crack cocaine in Portland and who had been Bellino's personal drug dealer for the past two years. Under the supervision of DEA agents, and at their

request, Bellino placed a recorded call to "Junior's" telephone number and arranged a meeting. During this initial conversation, as well as subsequent recorded calls, DEA agents noticed that "Junior" had a distinct Jamaican accent.

Early that same afternoon, and under constant audio and visual surveillance by the DEA, Bellino drove himself to a local market and waited for "Junior." The DEA had equipped Bellino with an audio transmitter and $500 in serialized bills. Using binoculars, DEA supervisor Agent Paul Wolf (Wolf) saw a black male cross the street and enter the passenger-side door of Bellino's sport-utility vehicle (SUV). While agents followed, Bellino drove in a large circle through nearby streets.

Once in Bellino's SUV, "Junior" sold Bellino thirteen "50 rocks" of crack cocaine, a total of 4.9 grams, for $500. Thereafter, the two returned to the local market and agents Wolf and Kate Barnard (Barnard) saw "Junior" get out of Bellino's SUV and enter a champagne colored Ford Windstar van. DEA agents followed the van long enough to determine that its registered owner was the defendant, Gentles--a black man. They also obtained a driver's license photograph of him. At trial, Wolf and Bellino testified that "Junior"--the man who entered the passenger-side door of Bellino's vehicle--was the defendant, Gentles. Agent Jack Daley (Daley), another member of the surveillance team, confirmed their testimony.

In June 2006, Laura Bisha (Bisha), a former drug addict and dealer, became the second CI for the DEA in its ongoing investigation of "Junior." On June 5, 2006, Bisha gave agents the telephone number for the person she knew as "Junior." It was the same number that Bellino had previously provided. While DEA agents listened in, Bisha made four recorded telephone calls to that number. During this exchange, Bisha and "Junior" arranged to meet at a local mall. In preparation for this meeting, DEA agents provided Bisha with $500 in serialized bills and a backpack equipped with a camera, microphone, and transmitter. DEA agents observed a black Ford Taurus pull up next to Bisha as she stood waiting in front of the mall; she climbed into the rear seat. At trial, Bisha testified that the man sitting in the front passenger seat, whom she knew as "Junior," was Gentles. A video recording of the transaction showed "Junior" pass a package to Bisha. During this transaction, "Junior" sold five grams of crack cocaine, in fourteen separate baggies, to Bisha in exchange for $500. Once again, agents followed "Junior" after the transaction was complete. This led them to 22 Wilson Street--the address listed on the registration for the Ford Windstar van.

Bisha purchased crack cocaine from "Junior" on two other occasions: on July 20, 2006 ($800 for 4.9 grams) and on August 14, 2006 ($500 for 4.5 grams). At trial, Barnard and Agent Paul Buchanan (Buchanan), another member of the surveillance team, both

testified that the man they observed meeting Bisha on these two occasions was the defendant, Gentles. Testing and analysis following each transaction confirmed that the drugs were indeed crack cocaine.

On July 9, 2008, Gentles was indicted on four counts of distribution of cocaine base, also known as crack cocaine, in violation of 21 U.S.C. § 841(a)(1). A warrant for his arrest issued the same day, and Gentles was arrested on July 14, 2008.

Gentles's trial began on December 8, 2008. While he did not testify, his primary defense was misidentification--that he was not "Junior." Gentles's counsel emphasized that none of the videotapes showed "Junior's" face, that the CIs were not credible, that their memories had faded, and that no records connected Gentles to the phones used in the recorded calls.

During the closing charge, the court stated that credibility was for the jury to decide, but that the CIs' testimony should be considered with "particular caution." The court went on to say that lawyers' arguments and statements were not evidence.

In his closing, defense counsel argued that the CIs were drug addicts whose testimony was "bought and paid for by the government" and that they were "in bed" with the government. In response to this argument, the Assistant United States Attorney (AUSA) suggested that the CIs had undertaken risks in testifying against Gentles and that the trial was dissimilar to those depicted

on television. During the AUSA's rebuttal, defense counsel made three separate objections, all of which were sustained by the court. Once the AUSA's rebuttal was finished, the court completed its instructions to the jury.

Immediately following the court's instructions, both parties were called to a sidebar. While neither party objected to the charge, defense counsel moved for a mistrial based on statements made by the AUSA during its rebuttal. The motion was denied. Before sending the jury to deliberate, the court reminded the jury that even though Gentles's name appeared in the transcripts of the recorded tapes, Gentles contested the identification. In its final statement to the jury, the court advised the jury to take heed that a federal criminal trial is significantly different from what is portrayed on television.

On December 9, 2008, after two hours of deliberation, a jury found Gentles guilty on all four counts. Thereafter, on March 31, 2009, the court sentenced Gentles to sixty-four months' imprisonment on each count, to be served concurrently, followed by four years' supervised release on each count, to be served concurrently, with the additional condition of participation in substance abuse treatment counseling. The court further recommended enrollment in a 500 hour drug treatment program while Gentles was serving his prison term. This appeal followed.

## II. DISCUSSION

### A. Denial of Gentles's Motion for Mistrial

### 1. Prosecutorial Misconduct

Gentles first argues on appeal that the district court erred in denying his motion for a mistrial based on statements made by the AUSA during rebuttal. Gentles asserts that these statements were based on facts not in evidence and prejudiced the outcome of his case, warranting a new trial. We review the denial of a motion for mistrial for an abuse of discretion. See United States v. DeCologero, 530 F.3d 36, 52 (1st Cir. 2008). The pertinent portion of the rebuttal that Gentles claims is impermissible went as follows:

> [AUSA]: [The CIs] were willing to come into court in a public hearing and testify before you all over the last couple of days. They were willing to air their dirty laundry and have it dragged through the courtroom, and they were willing to accept the risk, not that it--not that it happened in this case--
>
> [Defense counsel]: Objection.
>
> [The Court]: Sustained. Counsel, move on.
>
> [AUSA]: We live in the real world, ladies and gentlemen. In this world, the defendant is a crack dealer. In this world, we have proven that. This isn't CSI. There is something-- there has actually been a couple of studies done on how shows like CSI actually deal with--
>
> [Defense counsel]: Objection, Your Honor.
>
> [The Court]: Counsel, that's not in evidence.

> [AUSA]: It's not about what's not in evidence. The agents didn't ask what they had. They then--
>
> [Defense counsel]: Objection.
>
> [The Court]: Counsel, let's just stick with the evidence.

We begin by determining whether the AUSA's statements constituted misconduct. As we have previously stated, the term "misconduct" does not "suggest deliberate wrongdoing but rather . . . a statement of fact that is mistaken or unsupported by any evidence." United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007). Cognizant of this definition, we think it is clear that the AUSA's statements constitute impermissible argument and therefore amount to prosecutorial misconduct. First, there was absolutely no evidence presented at trial that Gentles was a violent man who would retaliate against the CIs. Accordingly, any argument asserting otherwise was improper. See United States v. de Leon Davis, 914 F.2d 340, 345 (1st Cir. 1990); see also 3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice and Procedure § 555 (3d ed. 2004) ("It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact."). Similarly and as the district court admonished,

there was no evidence of any studies, CSI or otherwise, presented at trial.[1]

Although we find that misconduct occurred, misconduct alone is insufficient to reverse a conviction absent a showing of prejudice. See Azubike, 504 F.3d at 38. To determine if prejudice resulted, "the test is whether the prosecutor's misconduct so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." Id. at 39 (quoting United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999)) (internal quotation marks omitted). This test is composed of three separate prongs. First, we determine "whether the prosecutor's conduct was isolated and/or deliberate"; next, we consider "whether the trial court gave a strong and explicit cautionary instruction"; and finally we determine "whether it is likely that any prejudice surviving the instruction could have affected the outcome of the case." Id. (citing Joyner, 191 F.3d at 54).

### a. Statements Regarding CIs' Risk

In applying the first prong of the test, we agree with the government that the AUSA's statements relating to risk were unintentional, brief, and benign. See United States v. Shoup, 476 F.3d 38, 44 (1st Cir. 2007)(finding no plain error where prosecutor's references were "relatively benign" and there was no

---

[1]"CSI" is the abbreviation for "Crime Scene Investigation," a television series about police investigation.

indication that the references were "deliberate"). The moment defense counsel objected, the court sustained the objection and told the AUSA, "Counsel, move on." Thereafter, the AUSA never returned to the subject of risk. Cf. Azubike, 504 F.3d at 40-42 (repeated reference by AUSA to improper topics). Though we find the AUSA's remarks improper, the court's immediate directive neutralized any prejudice to Gentles.

Moving to the second prong, while the district court did not give a curative instruction, we first note that one was not requested. Nevertheless the court, on its own initiative, instructed the jury twice during the opening charge and a third time in the closing charge that lawyers' arguments were not evidence. See United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007)(finding no error where defendant failed to request a curative instruction and court gave general instructions before deliberation as to what the jury could and could not consider as evidence). The court further instructed that if it had sustained an objection, the jury should not speculate about what was stricken. See id. It is a well established tenet of our judicial system that juries are presumed to follow such instructions. United States v. Riccio, 529 F.3d 40, 45-46 (1st Cir. 2008). Given the court's ample admonishments, it is unlikely that any prosecutorial misstatement referencing unsubstantiated risk to the CIs sullied the jury's verdict.

Lastly, applying prong three of the test, we find that there was no prejudice because "this is not a close case and there is no likelihood that the remarks could have affected its outcome." Riccio, 529 F.3d at 46. Based on the record, it is clear that there was an abundance of independent evidence that Gentles was the man known by the CIs as "Junior."[2] See id. "Considering the evidence in this case, the 'terse character of the remarks' and the thorough [general] instructions given by the court, it is unlikely that the remarks altered the result of the trial." Id.; see also Joyner, 191 F.3d at 54 (standard corrective instruction sufficient to dissipate all prejudice where there was "overwhelming evidence of [the defendant's] guilt . . . which . . . eliminate[d] any lingering doubt that the remarks could have unfairly prejudiced the jury's deliberations").

### b. Statements Regarding "CSI effect" and "studies"

We further conclude that the AUSA's comments about the "CSI effect" and "studies" did not warrant a mistrial. First, as was the case with the comments regarding risk, the moment defense counsel objected to the remark, the court sustained the objection. The court also admonished the AUSA by saying, "Counsel, that's not

---

[2]The evidence admitted at trial, establishing guilt, included DEA investigators' observation of all four transactions, videotapes, still photographs, audio recordings capturing a distinct Jamaican accent, the car registration of the Ford Windstar van in Gentles's name, and lastly the house address investigators were led to, 22 Wilson Street, which was the address listed on the registration for the Ford Windstar van.

in evidence." Furthermore, after the objection was sustained, the AUSA never returned to the subject of CSI or the specific studies about it. While the AUSA did follow up with an incomplete statement regarding what was not in evidence, defense counsel once again objected immediately. The court sustained the objection and cautioned the AUSA, "Counsel, let's just stick with the evidence."

Second, while the court did not give a curative instruction immediately following the remark, it did, during the final instruction, caution that a federal criminal trial is very different from what jurors see on television. This instruction was in addition to the three other repeated instructions throughout the trial that lawyers' arguments were not evidence. See de Leon Davis, 914 F.2d at 345 (holding that trial court's instructions to the jury were sufficient to correct any possible prejudice where jury was "amply admonished" on the point that argument of counsel was not evidence, and finding it unlikely that any prejudice remained to "infect the verdict").

Finally, any statements regarding the "CSI effect" and "studies" did not prejudice Gentles to such an extent that the outcome of his trial was affected. Again, there was substantial independent evidence to convict Gentles of the crimes charged. Furthermore, in denying Gentles's motion for a mistrial, the court found that there was no prejudice because the AUSA "did not get into

-12-

the actual argument . . . ." This conclusion is supported by the record.

Based on the foregoing, we conclude that although prosecutorial misconduct occurred, it was isolated and not deliberate, the general instructions given to the jury on three separate occasions that attorney arguments were not evidence were adequate, and finally, there is no chance that the remarks made prejudiced the outcome of Gentles's trial. After careful review of the proceedings below, "it is clear that the district court did not abuse its discretion in denying [Gentles's motion] for a mistrial." Riccio, 529 F.3d at 45.

## B. Improper Vouching

Gentles next argues that certain statements made by the AUSA during his opening statement and closing argument improperly vouched for the credibility of the CIs, prejudicing the outcome of his trial. "[B]ecause no objection was raised at trial, we review only for plain error." United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006). "Review for plain error entails four showings:(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." See United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010)(quoting United States v. Duarte, 246

F.3d 56, 60 (1st Cir. 2001)). We begin our analysis with a discussion of the applicable legal framework.

"Improper vouching occurs when the government place[s] the prestige of the United States behind a witness by making personal assurances about the credibility of a witness . . . or implies that the jury should credit the government's evidence simply because the government can be trusted." Robinson, 473 F.3d at 396 (internal quotation marks omitted). "Although the prosecution's success often depends on its ability to convince the jury of a particular witness's credibility, it cannot entice the jury to find guilt on the basis of a [government] agent's opinion of the witness's veracity." United States v. Pérez-Ruiz, 353 F.3d 1, 13 (1st Cir. 2003). Gentles alleges that the AUSA improperly vouched for the CIs on four separate occasions. We will address each in turn.

> In the first challenged remark, the AUSA said,

> Unfortunately for the defendant in 2006, for different reasons, [the CIs] had decided to start working for the US Drug Enforcement Administration, DEA, in an undercover capacity.
> So on these four occasions in 2006, the defendant was not only selling crack cocaine to [the CIs], he was selling crack cocaine to [the] DEA.

According to Gentles, these statements by the AUSA were not based on facts in evidence and further suggested that the CIs were agents of the DEA. We disagree. To the contrary, the fact that the CIs

-14-

were acting on the DEA's behalf was made clear by the AUSA during the government's direct case. See United States v. Torres-Galindo, 206 F.3d 136, 143 (1st Cir. 2000)("The prohibition of improper vouching is intended to keep the government from inviting a verdict based on facts not before the jury or on a prosecutor or government witness's personal assurance of credibility."). On direct examination, agents described how and when the CIs came to cooperate with the DEA, described the cooperation agreements signed by both CIs, and testified to the dollar amount each CI was paid. Moreover, despite Gentles's allegations, the record makes clear that the AUSA never said that the CIs were "agents of the DEA." Furthermore, the fact that Gentles did not object to these challenged remarks at the time they were made, yet objected to other statements made by the AUSA throughout the trial, indicates that even Gentles himself failed to regard the comments as having a damaging effect. See United States v. Procopio, 88 F.3d 21, 31 (1st Cir. 1996)("The fact that the defense did not object also may suggest that,in the conditions of the courtroom, the passage in question passed by as mere rhetoric."). Accordingly, we find unpersuasive Gentles's contention that the AUSA's remarks had the effect of bolstering the credibility of the CIs. See United States v. Vásquez-Botet, 532 F.3d 37, 54 (1st Cir. 2008). There was no error.

Gentles's second challenge is to remarks made during the government's closing argument. Here, the AUSA said, "[f]irst of

-15-

all, you've got to keep in mind that [the CIs] were providing information on a drug dealer. I would consider that public service that they are getting paid for." The Government concedes that the AUSA "would have been better advised to avoid using the pronoun 'I' or describing how he would characterize the informants' cooperation." See United States v. Smith, 982 F.2d 681, 684 & n.2 (1st Cir. 1993)(prosecutor's use of "I think" during closing argument was improper); see also United States v. Auch, 187 F.3d 125, 131 (1st Cir. 1999)(even though prosecutor's statement did not use "I think" language, statement conveyed a personal opinion to the jury and was therefore improper). Nonetheless, we tend to refrain from concluding that prosecutors improperly vouch for a witness when their remarks are made in an attempt to counter harmful allegations by the defense. See Pérez-Ruiz, 353 F.3d at 10; see also United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)(giving the prosecutor "greater leeway" when improper vouching came "in response to defense counsel's inflammatory statements").

In this case, the AUSA's remarks were in direct response to defense counsel's arguments that the CIs were getting a "complete pass" for their own wrongdoing, gave testimony that was "bought and paid for by the Government," and were "in bed" with the Government. The AUSA's closing argument was "a logical counter to the assertions of defense counsel" that the CIs were not credible. Pérez-Ruiz, 353 F.3d at 10. Moreover, Gentles's failure to object to the remark

-16-

suggests that even he thought the remark had little impact upon the jury and was not prejudicial.  See Procopio, 88 F.3d at 31.  The AUSA's remark did not constitute plain error.

Gentles's third vouching challenge is to statements made by the AUSA during rebuttal.  Specifically, the AUSA said,

> [The CIs] weren't drug dealers looking for a profit like [Gentles], the defendant.  On occasions that they used, they shared--they pooled their resources together.  They may have gone to a contact to get drugs and share with other people and under the legal definition, that is distribution, but they weren't doing it for profit, and there is a big difference between that and what the conduct of [Gentles] has been.

Gentles argues that these remarks misrepresented the evidence because both CIs admitted to selling drugs in the past.  He further alleges that the remarks improperly conveyed the AUSA's personal opinion to the jury.

While it is true that both Bellino and Bisha admitted on cross-examination that they sold drugs, the AUSA elicited extensive evidence of both cooperators' drug use and distributions, without objection, at the outset of the AUSA's direct examination of both CIs.  See Torres-Galindo, 206 F.3d at 143 (finding no wrongdoing where prosecutor's reference was to facts in the record).  Moreover, the AUSA's emphasis on the CIs' purchase, use, and sharing of drugs was directly in response to Gentles's credibility attack on both CIs for those very reasons.  Specifically, Gentles suggested that because the CIs engaged in the same conduct as he, they should not

-17-

be believed.  See United States v. Sepulveda, 15 F.3d 1161, 1189 (1st Cir. 1993)(arguments that "are incited or invited by, or fairly respond to, defendants' closing statements" generally not considered prejudicial, particularly where the argument does not "escalate the level of fire and brimstone that characterized the defense's oratory, and do not provoke a contemporaneous objection"). Furthermore, the record shows that the district court instructed the jury on two separate occasions that it was not necessary to show that Gentles benefitted in any way from distributing drugs in order to convict him of the crimes charged.  "[A]s we have noted many times, we presume juries understand and follow the court's instructions . . . ." Vásquez-Botet, 532 F.3d at 56.  Accordingly, the AUSA's remarks did not constitute plain error.

Gentles's last challenge is also to the rebuttal, where the AUSA stated, "[t]hey were given letter immunity because the Government wanted them to have no reservation about telling the truth, the whole truth and nothing but the truth, and yes, that includes their past relevant conduct which is the use, possession and occasional distribution of crack cocaine."

Gentles contends that this remark suggested to the jury that the Government had independently verified the CIs' testimony. We think that is a strained interpretation indeed.  Even if such an interpretation were plausible, and we do not think that it is, we have held that "when a prosecutor's comments, fairly viewed, are

-18-

susceptible to two plausible meanings, one of which is unexceptionable and one of which is forbidden, context frequently determines meaning." United States v. Taylor, 54 F.3d 967, 979 (1st Cir. 1995). Accordingly, this court will not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Id. Furthermore, we have held that "a prosecutor properly may admit a witness's plea agreement into evidence, discuss the details of the plea during closing arguments, and comment upon a witness's incentive to testify truthfully." United States v. Bey, 188 F.3d 1, 7 (1st Cir. 1999). Lastly, during cross-examination of both CIs, defense counsel insinuated that their immunity agreements gave them an incentive to frame Gentles. Consequently, the AUSA's remark was a "logical counter" to defense counsel's theory. Pérez-Ruiz, 353 F.3d at 10. This remark, like all the others before it, does not constitute plain error.

### C. Evidence of Gentles's Prior Bad Acts

At trial, the AUSA elicited testimony from the CIs on direct examination that Gentles had sold them drugs prior to their cooperation with the DEA. On appeal, Gentles argues that this evidence should not have been admitted under Rule 404(b) because its sole purpose was to demonstrate his propensity to commit the crimes charged. Alternatively, Gentles argues that even if the evidence

was admissible under Rule 404(b), it should not have been admitted under Rule 403 because "its probative value was substantially outweighed by 'the danger of unfair prejudice.'" United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000) (quoting Fed. R. Evid. 403)). Because Gentles failed to object to this evidence during trial, we again review for plain error. Hansen, 434 F.3d at 101. We begin with the applicable legal framework.

Under Rule 404(b), evidence of a defendant's prior bad acts may not be admitted to prove his criminal character or propensity to commit crimes similar to those he is on trial for.[3] However, Rule 404(b) does not provide an absolute bar. To be sure, evidence of prior bad acts may be admitted if it passes two tests. First, the evidence must have "special relevance" to an issue in the case, and the evidence must not include "bad character or propensity as a necessary link in the inferential chain." United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996). Prior bad act evidence is said to have special relevance if it pertains to issues such as the defendant's intent, knowledge, plan, absence of mistake, or identity. Varoudakis, 233 F.3d at 118 (discussing Fed. R. Evid.

---

[3]Rule 404(b) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

404(b)).  Second, "[e]ven if the special relevance is established, the evidence must still satisfy Rule 403" in order to be admitted. United States v. Whitney, 524 F.3d 134, 141 (1st Cir. 2008).

In this case, both parties agree that the only contested issue presented to the jury was the identity of "Junior"-- the man who sold the CIs drugs.  Beginning with his opening statement, defense counsel attempted to downplay the evidence against Gentles and focus the jury's attention on the fact that the videotapes of the drug transactions failed to show "Junior's" face.  Additionally, defense counsel pointed out to the jury that Gentles's name was never mentioned on the audiotapes and that while the CIs identified Gentles as "Junior," their testimony should not be believed.  Moreover, every time recordings of the transactions were admitted, the court reminded the jury that Gentles did not concede that he was a party to any conversation and further, that it was up to the jury to decide whether the voice that was recorded was his.

We think it is undeniable that the evidence of Gentles's prior encounters with the CIs was specially relevant to the contested issue of identity--the sole issue at trial--particularly because the only witnesses who had face-to-face encounters with "Junior" were the CIs.  Furthermore, this evidence had the requisite special relevance required by Rule 404(b) because it allowed the jury to understand the mutual trust between Gentles and the CIs that made Gentles willing to respond to their requests to purchase drugs.

-21-

See Varoudakis, 233 F.3d at 121 (finding that car fire evidence was specially relevant under Rule 404(b) because it demonstrated the background and relationship between the defendant and co-conspirator). Nonetheless, our discussion does not end here. Even when evidence satisfies the special relevance required by Rule 404(b), it must also withstand scrutiny under Rule 403.

Rule 403 requires the exclusion of evidence if "its probative value is substantially outweighed by 'the danger of unfair prejudice.'"[4] Varoudakis, 233 F.3d at 121 (quoting Fed. R. Evid. 403). Rule 403 makes clear that defendants are protected only "against unfair prejudice, not against all prejudice." United States v. Rivera-Gomez, 67 F.3d 993, 997 (1st Cir. 1995). On appeal, a district court's balancing determination under Rule 403 of probative value versus unfair prejudice is entitled to deference. See id. Accordingly, "only rarely--and in extraordinarily compelling circumstances--will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair

_____

[4]Rule 403 states in its entirety that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

effect." United States v. Li, 206 F.3d 78, 84-85 (1st Cir. 2000)(internal quotation marks and citation omitted).

Gentles contends that even if his past drug transactions with the CIs had special relevance, the evidence was nonetheless unfairly prejudicial because other evidence was available to prove identity and because the prior bad act was identical to the current crimes charged. We disagree. While there was a substantial amount of independent evidence in this case that could lead a reasonable juror to conclude that Gentles was "Junior," none of the recordings ever showed "Junior's" face, nor was Gentles's name ever heard on any of the recordings. For this reason, the court continuously reminded the jury that Gentles disputed his involvement in the four transactions. Indeed, defense counsel used these facts as his primary target against the Government's case in an attempt to create reasonable doubt in the minds of the jury. Moreover, it is undisputed that the only two witnesses who ever had face-to-face contact with "Junior" during the transactions were the CIs. Accordingly, we find unconvincing Gentles's argument that other evidence was available in this case "rendering negligible [the AUSA's] need to [prove identity] by the prior bad acts." United States v. Lynn, 856 F.2d 430, 436 (1st Cir. 1988).

Gentles next argues that because his prior bad acts were identical to the crimes he was on trial for, the evidence was unfairly prejudicial because it allowed the jury to infer that

Gentles had a criminal propensity to commit the crimes charged. We have previously noted that,

> [t]here is clearly a tension between Rules 404(b) and 403. The more similar the prior bad act evidence is to the charged crime, the more likely it is to be deemed relevant under 404(b). Yet the more the prior bad act resembles the crime, the more likely it is that the jury will infer that a defendant who committed the prior bad act would be likely to commit the crime charged.

Varoudakis, 233 F.3d at 123. Gentles's reliance on Varoudakis is misplaced. In Varoudakis we held that while the evidence did have special relevance under Rule 404(b), it was nonetheless inadmissible under Rule 403 because it was unfairly prejudicial to the defendant. Id. at 118-126. In so holding we stated that, "the probative value of the . . . evidence was minimal." Id. at 123. We further found that, "[t]he government . . . did not need the evidence to prove Varoudakis's knowledge or intent . . . ." Id.

As we previously stated, the probative value of Gentles's prior encounters with the CIs was significant. Not only was identity the sole contested issue at trial, but the CIs were the only two witnesses ever to see "Junior's" face during the course of the four separate transactions. Furthermore, while the Government did present an arsenal of independent evidence at trial, defense counsel repeatedly reminded the jury that there was no picture of Gentles's face and that they never heard Gentles's name on any of the recordings. The probative value of Gentles's prior drug

-24-

transactions with the CIs, which demonstrated their prior familiarity with Gentles, was not substantially outweighed by the danger of unfair prejudice. No abuse of discretion occurred.

### D. Reasonableness of Gentles's Sentence

Gentles's final argument challenges the reasonableness of the sentence imposed by the district court. Gentles was sentenced to sixty-four months' imprisonment, followed by four years of supervised release and substance abuse treatment counseling. On appeal, Gentles argues that the court issued a sentence greater than necessary to achieve the purposes of 18 U.S.C. § 3553 by over-relying on the Sentencing Guidelines (Guidelines) and overestimating Gentles's risk of recidivism.

"We review a district court's sentence for reasonableness, which involves a procedural as well as substantive inquiry." United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008).

> We first determine whether the district court made any procedural errors "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on erroneous facts, or failing to adequately explain the chosen sentence--including an explanation for any deviation from the Guidelines range."

Id. (quoting Gall v. United States, 128 S.Ct. 586, 597 (2007)). Gentles concedes that the district court properly calculated the

-25-

applicable guidelines sentencing range (GSR) and simultaneously fails to mention any other possible procedural error. Accordingly, on appeal we consider only "the substantive reasonableness of the sentence imposed and review the sentence for abuse of discretion." Id.

Under this standard, we afford the district court wide discretion in sentencing. "[A]fter the court has calculated the GSR, sentencing becomes a judgment call . . . . " United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008). Ultimately, "the linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result." Id. at 96. "Where the district court has substantially complied with this protocol and has offered a plausible explication of its ultimate sentencing decision, we are quite respectful of that decision." United States v. Dixon, 449 F.3d 194, 204 (1st Cir. 2006).

Gentles argues that the district court, in setting Gentles's base offense level, erroneously adopted the ratio disparity between powder and crack cocaine that the Guidelines provide and as a result, essentially treated street-level, nonviolent drug offenses as equal to the wholesale trafficking of cocaine, heroin, or marijuana. Citing Kimbrough v. United States, 128 S.Ct. 558 (2007), Gentles concedes that the sentencing court is not obligated to vary from the GSR, but asserts that in this case, it nonetheless should have done so. We disagree. As an initial

matter, the fact that the sentencing court chose to apply, rather than vary from, the GSR ratio is not a basis for reversal. See United States v. Gibbons, 553 F.3d 40, 46 (1st Cir. 2009). As this court explained in Gibbons, Kimbrough does not require sentencing courts to consider the disparity between powder and crack cocaine, but instead, gives them the discretion to do so. Id. Second, although Gentles avers that the GSR applied to his case was unduly harsh, he failed to ask the sentencing court for a variant sentence based on the disparity between powder and crack cocaine. We think commonsense dictates that Gentles cannot now benefit from such a glaring omission through an attempt to transfer responsibility to the district court.

Additionally, the court's conclusion that "this [was] a very serious drug conviction" is not only supported by the record, but is "also a reflection of a permissible consideration in the sentencing calculus." Dixon, 449 F.3d at 204. Over the course of four transactions, Gentles sold a total of 19.3 grams of crack cocaine. Moreover, contrary to Gentles's contentions, the court did not impose the sentence based on a "faulty analysis of [Gentles's] future risks of recidivism." Instead, the court focused on a variety of factors, including specific deterrence, protecting the public from future crime, and Gentles's long history of drug use-- all "permissible sentencing consideration[s]." Id. at 205. To be sure, the court stated,

> I'm not persuaded that Mr. Gentles has
> overcome his [drug] problem and will not
> continue to be tempted by this kind of
> activity. I think there is a real need for
> specific deterrence of Mr. Gentles, as well as
> protecting the public from further crimes.
> I'm troubled, certainly, that he has asked to
> be relieved of any supervised release
> condition that would involve counseling. That
> certainly tells me he doesn't understand
> addiction if he thinks there's some program in
> prison's [sic] going to cure him and that he
> doesn't need [counseling] later.

This was a reasonable assessment. According to Gentles's Pre-Sentence Report (PSR), Gentles had a history of substance abuse that began when he was a teenager. Furthermore, over the course of seven years, Gentles had seven charges brought against him for drug-related crimes.

It merits a brief discussion to note the irony that the sentence imposed was actually advantageous to Gentles. With a sentencing range of fifty-seven to seventy months, the district court imposed a sixty-four month sentence, directly in the middle. The district court would have been within its discretion to impose a higher sentence based on Gentles's past attempted murder conviction. In declining to do so, the court stated,

> [W]hat I'm going to do here is impose a
> sentence that's right in the middle of the
> guideline range, which is to say 64 months.
>     I'm not going higher than that despite
> the attempted murder conviction. I'm not
> persuaded that that is necessarily a
> recidivist crime that predicts that Mr.
> Gentles will continue to engage in [that type]

-28-

of conduct.  This is quite a different kind of
conduct that he's convicted of here.

We think the court's explanation on this issue refutes any lingering contention that the court did not accurately consider the § 3553(a) factors.  Finally, we note that on the day that Gentles was arrested for the crimes discussed in this appeal, 3.5 grams of crack cocaine were found in his sock.  However, that amount was not considered in calculating Gentles's offense level.  Had it been, the sentencing range of fifty-seven to seventy months would have increased to seventy to eighty-seven months and Gentles would undoubtedly be serving a longer sentence.

In any event, the "district court was well within its discretion to sentence [Gentles] to [sixty-four] months' imprisonment, a sentence [in the middle] of the GSR."  Gibbons, 553 F.3d at 47.  The sentence was not unreasonable.

## III.  CONCLUSION

For the foregoing reasons, Gentles's conviction and sentence are affirmed.