# United States Court of Appeals
## For the First Circuit

Nos. 13-2155,
13-2500,
14-1040,
14-1078

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ PEÑA-SANTO,
JOSÉ RAMÓN VICENTE-ARIAS,
JONATHAN GIL-MARTÍNEZ,
MANUEL LIRIANO-DE LA CRUZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before
Torruella, Selya, and Dyk,[*]
Circuit Judges.

Carlos M. Sánchez-La Costa, for appellant Peña-Santo.
Barbara J. Sweeney, for appellant Vicente-Arias.
Kenneth Seiger, for appellant Gil-Martínez.
Leslie W. O'Brien, for appellant Liriano-de la Cruz.
Tiffany V. Monrose, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

---

[*] Of the Federal Circuit, sitting by designation.

October 14, 2015

**TORRUELLA, <u>Circuit Judge</u>.**  Defendants-Appellants José Peña-Santo ("Peña-Santo"), José Ramón Vicente-Arias ("Vicente-Arias"), Jonathan Joel Gil-Martínez ("Gil-Martínez"), and Manuel Liriano de la Cruz ("Liriano") (collectively "Appellants") were jointly tried and convicted of conspiring to import cocaine and heroin into the United States, in violation of 21 U.S.C. §§ 952(a), 960, and 963, and conspiring to possess with intent to distribute cocaine and heroin on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1), 70504(b)(1), 70506(a).  Peña-Santo and Liriano were additionally convicted of illegally reentering the United States, in violation of 8 U.S.C. § 1326(a)(2) and (b)(1).  Appellants appeal their conspiracy convictions mainly on the grounds that improper expert testimony and the government's conduct warrant reversal of their convictions.  They also assign error to the denial of their motions for judgments of acquittal.  Finally, Gil-Martínez challenges the substantive reasonableness of his sentence.  We have reviewed Appellants' claims carefully and do not find merit in any of them.  Accordingly, we affirm.

## I. <u>Facts</u>[1]

On the night of April 12, 2012, Ryan Perry, a Customs and Border Patrol ("CBP") agent working as a camera operator and

---

[1]  We briefly summarize the relevant facts, reserving for our analysis a more detailed discussion of the facts relevant to each issue presented on appeal.

-3-

patrolling the waters from an aircraft, detected a target of interest with "lights out" seventeen nautical miles off the coast of Dorado, Puerto Rico, around 10:00 p.m. The target was a blue-colored wooden yola,[2] between twenty and twenty-five feet long, riding "very low" in the water, and carrying two motors and six fuel drums. A Maritime Patrol aircraft, along with the U.S. Coast Guard marine unit, the Puerto Rico Joint Forces of Rapid Action ("FURA," for its Spanish acronym), and a CBP helicopter, coordinated an intercept of the suspect vessel. When the Coast Guard marine unit approached the vessel, the individuals were moving "erratically" on the boat. Perry saw "objects being thrown from the yola." Another officer who joined the interception of the vessel, Luke Berguis from the Coast Guard, reported seeing "large, heavy bags being tossed over by the multiple crew members," as well as "small backpacks" and "smaller objects" that looked like cell phones and GPS units. Agent René Galarza, of U.S. Immigration and Customs Enforcement ("ICE"), after turning the helicopter's spotlight on the vessel also saw "individuals dumping what appeared to be bales."

At approximately 11:39 p.m., nearly four miles off the coast of Dorado, the Coast Guard marine unit intercepted the yola, which had six men on board, and ordered the men to raise their

---

[2] A yola is a small fishing boat. For purposes of this opinion, "yola" and "vessel" will be used interchangeably.

-4-

hands, which they did after some initial hesitance. FURA, along with the Coast Guard marine unit, later retrieved the objects that had been thrown into the water, which turned out to be "six heavy dark colored [gym] bags wrapped in duct tape" that each had a "block shape." Inside the bags were eight kilograms of 50% pure heroin packaged in eight egg shapes and 146.5 kilograms of 74.8% pure cocaine packaged in 131 brick shapes. The six men, identified as Peña-Santo, Vicente-Arias, Gil-Martínez, Liriano, Bonifacio Toribio-Almonte, and Alejandro Difot-Santos, all citizens of the Dominican Republic, were arrested.

A grand jury returned a superseding indictment charging the six men with conspiracy to import cocaine and heroin into the United States, in violation of 21 U.S.C. §§ 952(a), 960, and 963 (Count 1), and conspiracy to possess with intent to distribute cocaine and heroin on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1), 70504(b)(1), 70506(a) (Count 2). Peña-Santo and Liriano were also charged with illegally reentering the United States, in violation of 8 U.S.C. § 1326(a)(2), (b)(1), respectively (Counts 3 and 4).[3] Difot-Santos and Toribio-Almonte pleaded guilty while Appellants were jointly tried.

_____

[3] Peña-Santo and Liriano stipulated to the fact that they had been previously removed from the United States and that they had no petition pending with the U.S. Citizenship and Immigration Services to enter the United States lawfully. Peña-Santo further stipulated to the fact that he had a previous felony conviction.

At trial the government presented the testimony of Perry, Berghuis, Galarza, Andrew Resk, and Joel Candelario, all of whom participated in the interception of the yola on April 12, 2012. Berghuis testified that wooden boats with low profiles and no navigation lights, such as the yola used by Appellants, are harder to see and to pick up on radar. He further testified that Appellants' yola was painted blue on both the outside and the inside, which made it "very hard to see at night" from an "aerial aspect"; that it had excessive horsepower and fuel for its size; and that it did not have any fishing or other recreational gear on board. Instead, it carried multiple open condoms, which, based on his experience, are often used to keep dry small objects such as wallets and cell phones. Berghuis also identified Appellants in court as four of the six men on board the yola when it was intercepted and testified that he observed that more than one individual was needed to lift the bags which had been thrown overboard when the yola was approached by law enforcement.

The government also presented the testimony of Víctor Taboada, who was on patrol on the Coast Guard Cutter Cushing on the night of the interception; Abel Nasser, who works with ICE and the Department of Homeland Security; and Carmen Cacho ("Ms. Cacho"), a chemist employed by CBP. They testified about the type, purity, quantity, and weight of the narcotics recovered during the interception of the yola.

In addition, the government presented the testimony of Drug Enforcement Administration agent Christopher Conchin ("Agent Conchin"), who had experience in narcotic cases and international maritime interdictions. The district court qualified Agent Conchin as an expert witness and allowed him to testify as to the value, packaging, and mode of transportation of narcotics. Agent Conchin testified regarding how narcotics' street price depends on the place of sale. He also testified that drugs are usually wrapped in plastic and packaged in same-size bricks. As to the mode of transportation, Agent Conchin testified that drugs are typically transported in go-fast boats or yolas, which are usually painted blue to blend in with the water, have more than one motor (usually two or three), are either open or have a compartment to "put stuff underneath," and carry numerous gasoline drums that are switched off during the voyage. In addition, he testified that vessels transporting narcotics generally have four to six people on board and that each has a specific duty. He further testified that, in his experience, "in the cases that [he has] worked, . . . individuals not connected with the trafficking of narcotics" have not been involved in the transportation.

After a four-day jury trial, Appellants were found guilty on all charges. Appellants moved for a judgment of acquittal

pursuant to Fed. R. Crim. P. 29, which the district court denied.[4] The district court sentenced Peña-Santo to 120 months in prison, Vicente-Arias to 130 months, Gil-Martínez to 192 months, and Liriano to 240 months. In addition, they were each sentenced to five years of supervised release. These timely appeals followed.

## II. Discussion of Appellants' Claims

### A. Expert Testimony

#### 1. Background

The government intended Agent Conchin to testify as to "the quantity of the narcotics, the value of the narcotics, and . . . to the fact that [Appellants] weren't just by happenstance" in the vessel. Appellants questioned the need for his testimony, arguing that the question before the jury of whether they were part of a conspiracy to distribute drugs did not require complex insight. The district court allowed the witness to testify only with respect to the value, packaging, and mode of transportation of drugs.

At trial, Agent Conchin testified that, in his experience, random people unconnected to drug trafficking would not be on board vessels with drugs. According to him,

> [t]he people that are on those boats are there
> for one purpose, and that's to get the drugs
> to where they're going, and they're there for
> protection. They're there to switch out the

---

[4] They also requested a new trial pursuant to Fed. R. Crim. P. 33, which was also denied.

-8-

hoses like I mentioned, because you can't do it with just [one] person. You have the captain who is the navigator to get you to where it's going, the exact point. You have a mechanic in case it breaks down and you have problems on the water. Everybody has a duty, a specific duty.

Appellants claim that the district court abused its discretion in allowing Agent Conchin to testify about the different roles of individuals on board vessels transporting drugs. They argue that this testimony should have been stricken from the record because it exceeded the scope of the topics allowed by the district court. In addition, they claim that Agent Conchin improperly identified the roles of the Appellants in the charged conspiracy without having personal knowledge of it and that he addressed the ultimate issue for the jury -- whether Appellants were members of the conspiracy and possessed the intent to import and distribute narcotics -- which is prohibited by Rule 704(b) of the Federal Rules of Evidence and constitutes reversible error pursuant to this court's holdings in United States v. Meises, 645 F.3d 5 (1st Cir. 2011); United States v. Flores-De-Jesús, 569 F.3d 8 (1st Cir. 2009); and United States v. Casas, 356 F.3d 104 (1st Cir. 2004). We disagree.

**2. Applicable Law and Analysis**

It is well established that the district court "enjoys leeway in deciding to admit or exclude expert testimony." United States v. Ladd, 885 F.2d 954, 959 (1st Cir. 1989). Rulings on

preserved evidentiary objections are reviewed for abuse of discretion.  Casas, 356 F.3d at 113.  Review of unobjected-to evidentiary rulings is for plain error.  Id.  Under this exacting standard, an appellant must show that (1) there was an error, (2) which was clear or obvious, (3) that affected his substantial rights, and (4) also seriously impaired the fairness, integrity, or public reputation of judicial proceedings.  United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011).  Because Appellants did not meaningfully object to the testimony they now challenge, our review is for plain error.

Appellants' first argument -- that Agent Conchin's testimony was inadmissable because it exceeded the scope of the topics allowed by the district court -- falls flat at the outset. The district court allowed Agent Conchin to testify about the "mode of transportation" of drugs.  Appellants cannot show that interpreting "mode of transportation" to include not only the physical description of vessels used to transport drugs, but also the process itself of transporting drugs in such vessels and the roles people perform while transporting the drugs amounts to error, much less clear or obvious error.  Thus, Appellants' claim cannot survive plain-error review.

Appellants' second argument suffers the same fate.  "For expert testimony to be admissible under Fed. R. Evid. 702, it must 'be relevant to the task at hand' and helpful to the jury in its

deliberations." United States v. García-Morales, 382 F.3d 12, 18 (1st Cir. 2004) (quoting United States v. López-López, 282 F.3d 1, 14 (1st Cir. 2002)). This court has approved the admission of expert testimony regarding "the operation of criminal schemes and activities" in drug trafficking cases, finding such testimony relevant and "helpful to juries in understanding some obscure or complex aspect of the crime." Id. at 18-19 (quoting United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994) (noting that "expert testimony regarding the description of a typical drug network [is] relevant to provide context to the jury in evaluating the offenses charged" (alteration in original) (internal quotation marks and citation omitted) (quoting United States v. Clarke, 24 F.3d 257, 269 (D.C. Cir. 1994)); see also, e.g., Flores-de-Jesús, 569 F.3d at 26 (holding that the expert witness "properly described the operation of drug points generally, including the various 'roles' typically involved in an intricate drug conspiracy and the practice of storing drugs intended for sale"); Ladd, 885 F.2d at 960 (holding that because "jurors are not expected to be familiar with the idiom and workings of the heroin community . . . [e]xpert interpretation of drug jargon and practices, supplied by one versed in the business, has often been admitted to assist the trier of fact in drug-trafficking cases").

The leeway enjoyed by the district court in determining the scope of expert witness testimony is limited by Rule 704(b) of

the Federal Rules of Evidence, which prohibits an expert witness from testifying that a "defendant did or did not have the mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b). "This bar does not, however, apply to 'predicate facts from which a jury might infer such intent.'" United States v. Schneiderhan, 404 F.3d 73, 81 (1st Cir. 2005) (quoting United States v. Valle, 72 F.3d 210, 216 (1st Cir. 1995)).

Here, Agent Conchin provided proper expert testimony. Appellants do not contest that the challenged testimony was relevant. In addition, because the nature of narcotics trafficking by vessels is likely outside the knowledge of the average layman, we find that Agent Conchin's testimony was likely to assist the jury in understanding the evidence or determining a fact at issue. See Fed. R. Evid. 702; Ladd, 885 F.2d at 960.

Furthermore, contrary to Appellants' contentions, Agent Conchin's testimony was not disallowed by Meises, Flores-de-Jesús, or Casas. In those cases we "particularly condemned testimony from . . . agent[s], not based on personal knowledge, describing the roles played in the drug conspiracy by individual defendants" because "[s]uch descriptions amount to impermissible testimony from the agent[s] 'that each of the defendants was guilty of the conspiracy charged.'" Meises, 645 F.3d at 13 (quoting Casas, 356 F.3d at 119); see also Flores-de-Jesús, 569 F.3d at 24 (holding

that the court erred in allowing the expert witness to identify the appellants by name and role in the conspiracy, where this testimony was not based on his personal knowledge); Casas, 356 F.3d at 118, 120 (stating that the agent's testimony, which identified the roles of each defendant in the drug conspiracy despite lacking personal knowledge of it, was not an appropriate subject for expert testimony). Unlike in the cases cited by Appellants, Agent Conchin did not identify Appellants' roles in the charged conspiracy, nor did he even refer to Appellants in particular or to their yola. Rather, based on his experience in narcotics cases and international maritime interdictions, he referred to "the people that are on those boats" as he testified about the general roles involved in the transportation of drugs by vessels. Thus, he did not need to have personal knowledge of Appellants' specific roles in the charged conspiracy; his testimony was in line with our precedent. See Flores-de-Jesús, 569 F.3d at 26 (allowing an expert witness to describe "the operation of drug points generally, including the various 'roles' typically involved in an intricate drug conspiracy"); García-Morales, 382 F.3d at 18-19; Ladd, 885 F.2d at 960.

In addition, Agent Conchin's testimony did not encroach upon the jury's factfinding function regarding the ultimate issue of guilt. He merely provided facts from which the jury could infer culpable intent. See Schneiderhan, 404 F.3d at 81; United States

-13-

v. DiMarzo, 80 F.3d 656, 659-60 (1st Cir. 1996) (holding under similar circumstances that the agent's testimony that "in his experience, innocent observers are not invited to accompany criminals engaged in completing a drug deal" did not "encroach upon the jury's factfinding function regarding the ultimate issue of guilt"); see also United States v. Valencia-Amezcua, 278 F.3d 901, 909 (9th Cir. 2002) (allowing expert witness to testify about the "aversion of large-scale methamphetamine producers to allow unaffiliated individuals near clandestine operations"). Moreover, the district court clearly instructed the jury that "mere presence" on the yola was insufficient to establish guilt and that it was for the jury to decide whether the government had met its burden of proving the necessary mens rea. See DiMarzo, 80 F.3d at 660. Therefore, there was no error, plain or otherwise, in allowing Agent Conchin's testimony.

We note, however, one improper statement made by Agent Conchin during cross-examination. Because Agent Conchin's descriptions about drug trafficking referred to millions of dollars of profit, Liriano's defense counsel asked Agent Conchin in cross-examination whether he knew if Liriano had any possessions, such as a house or jewelry. Agent Conchin began to respond, "To answer your question, obviously people that transport drugs such as your client," but did not finish his response because he was immediately interrupted by defense counsel, who -- although he did not object

to Agent Conchin's statement -- said, "That's not my question." On appeal, Peña-Santo -- but not Liriano -- claims that this response constituted improper testimony on his guilt. Because Peña-Santo neither objected to nor moved to strike to the statement, we review only for plain error. De Jesús-Viera, 655 F.3d at 57. Peña-Santos's claim fails under that stringent standard because he is unable to satisfy plain-error review's third and fourth prongs; that is, that it affected his substantial rights and that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Id. Such an effect cannot be attributed to a "single, isolated [and fleeting] statement" like this one, which was made in response to a question by defense counsel regarding a matter outside the scope of Agent Conchin's testimony. See United States v. Trinidad-Acosta, 773 F.3d 298, 307 (1st Cir. 2014).

## B. Sufficiency of the Evidence

Appellants claim reversible error by the district court in the denial of their respective motions for judgments of acquittal. See Fed. R. Crim. P. 29. They argue that the government demonstrated only that they were "merely present" on the vessel and that there was no evidence that they agreed to import or possess with intent to distribute the drugs. They also claim that the evidence presented at trial was consistent with their defense,

namely, that they were attempting to enter the United States illegally. We disagree.

### 1. Standard / Scope of Review

We review <u>de novo</u> the district court's denial of a Rule 29 motion for judgment of acquittal. <u>Trinidad-Acosta</u>, 773 F.3d at 310. In so doing, we view the evidence in the light most favorable to the jury's verdict, giving "equal weight to direct and circumstantial evidence." <u>United States</u> v. <u>Appolon</u>, 715 F.3d 362, 367 (1st Cir. 2013). We evaluate the sum of all the evidence and inferences drawn therefrom, and determine whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt. <u>United States</u> v. <u>Shaw</u>, 670 F.3d 360, 362 (1st Cir. 2012) ("Individual pieces of evidence viewed in isolation may be insufficient in themselves to prove a point, but in cumulation may indeed meet the mark."). Also, "[w]e do not assess the credibility of a witness, as that is a role reserved for the jury. Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence." <u>Trinidad–Acosta</u>, 773 F.3d at 310–11 (quoting <u>United States</u> v. <u>Troy</u>, 583 F.3d 20, 24 (1st Cir. 2009)). We will uphold the verdict unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt. <u>United States</u> v. <u>Azubike</u>, 564 F.3d 59,

64 (1st Cir. 2009). Accordingly, "defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (alterations omitted) (quoting United States v. O'Shea, 426 F.3d 475, 479 (1st Cir. 2005).

To sustain a drug-conspiracy conviction, the government must prove beyond a reasonable doubt that the defendant "knew about and voluntarily participated in the conspiracy, 'intending to commit the underlying substantive offense.'" United States v. Acosta-Colón, 741 F.3d 179, 190 (1st Cir. 2013) (quoting United States v. Ortiz de Jesús, 230 F.3d 1, 5 (1st Cir. 2000)). "An agreement to join a conspiracy may be express or tacit, and may be proved by direct or circumstantial evidence." Trinidad-Acosta, 773 F.3d at 311 (quoting United States v. Liriano, 761 F.3d 131, 135 (1st Cir. 2014)).

Appellants are right that their "'mere presence' at the scene of criminal activity is not enough" to convict them. See United States v. Guerrero, 114 F.3d 332, 342 (1st Cir. 1997). However, they grossly underestimate the strong circumstantial evidence supporting the jury's conclusion of guilt.

The evidence presented at trial, viewed in the light most favorable to the jury's verdict, showed that Appellants, along with two co-defendants, traveled from the Dominican Republic to the coast of Dorado, Puerto Rico, on a twenty-to-twenty-five-foot

wooden yola, which was painted blue both on the inside and outside to blend in with the water, had no navigation lights, and was riding "very low" in the water. Its lack of lights, low profile, color, and material made it very hard to be seen or be picked up on radar. It also had excessive horsepower and fuel for its size, and did not have any fishing or recreational gear on board. Instead, it carried six "block shape[d]" gym bags wrapped in duck tape, containing more than $3 million worth of heroin and cocaine. These bags were in plain view of everyone on board the yola.

Once the individuals on board the yola detected that they had been spotted by law enforcement, they started moving "erratically" on the boat, and "multiple crew members" started throwing the six bags, as well as small backpacks and objects that looked like cell phones and GPS units, into the water. The six bags were so large and heavy that more than one individual was needed to lift and throw each one overboard. Two different witnesses identified all four Appellants in open court as four of the six individuals on board the intercepted yola. There was also testimony that, when initially intercepted by law enforcement, Appellants first hesitated to comply with the officers' orders to stay put and raise their hands.

Furthermore, the jury also heard testimony from expert witness Agent Conchin about the way drugs are usually packaged (in "same size bricks"), the type of vessels used to transport drugs,

and the roles of people involved in the maritime transportation of narcotics.

This evidence, which included lay and expert witness testimony, a video,[5] and multiple photos,[6] coupled with the inferences that may be drawn therefrom, was enough for a reasonable jury to conclude beyond a reasonable doubt that Appellants were guilty of the conspiracy charges against them. Our conclusion is consistent with our precedent. For example, in United States v. Cuevas-Esquivel, 905 F.2d 510 (1st Cir. 1990), the defendants, who were apprehended on a thirty-to-forty-foot boat surrounded by floating bales of marihuana, raised arguments similar to those pressed by Appellants here. In rejecting their argument of "mere presence," this court held that

> [r]ationality support[ed] the jury's finding. The jury could without undue strain conclude that it was simply incredible that with only four persons on board a relatively small vessel, on its way to "nowhere," with an open cargo hold, surrounded by a sea of floating marihuana bales which some of the crew had been seen dumping, that all four were not participants in this criminal venture. It is entirely reasonable for the jury to conclude that conspirators, engaged in conduct which by its nature is kept secret from outsiders,

---

[5] On the video, the jury could see individuals on board the yola tossing bags overboard and law enforcement recovering them from the water, as well as the individuals' erratic movements when they were first detected by law enforcement and their hesitance to comply with the order to raise their hands.

[6] There were photos of the yola and the bags and drugs recovered from the water.

> would not allow the presence of innocent
> bystanders. Neither juries nor judges are
> required to divorce themselves of common
> sense, where, as here, the appellant's
> portrayal of himself as an innocent bystander
> is inherently unbelievable.

Id. at 515 (internal quotation marks and citation omitted) (quoting United States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982)); see also United States v. Rosa-Cariño, 615 F.3d 75, 81 (1st Cir. 2010) (noting that "[d]rug smugglers handling . . . valuable drugs are unlikely to involve unknowledgeable outsiders"); Guerrero, 114 F.3d at 342 (noting that "where the circumstantial evidence permits a jury to conclude that activities aboard a vessel concern the obvious presence of contraband, the jury reasonably may infer the crew's knowing participation in the venture"); United States v. Piedrahita-Santiago, 931 F.2d 127, 130 (1st Cir. 1991) (holding where seven crewmembers were on board a "small" forty-foot vessel that "[a] larger crew than ordinarily needed for navigation purposes suggests that the crew was hired for the purpose of loading and unloading cargo rather than merely steering the vessel"); United States v. Luciano-Pacheco, 794 F.2d 7, 11 (1st Cir. 1986) (stating that "given the necessarily close relation of crewmembers cramped onto a vessel . . . with marijuana, it is entirely reasonable for the jury to conclude that conspirators . . . would reasonably not allow the presence of innocent bystanders in their midst while conducting a lengthy, illegal operation") (internal quotation marks and citation omitted)

-20-

(quoting United States v. Beltrán, 761 F.2d 1, 6 (1st Cir. 1985); Smith, 680 F.2d at 259-60 (1st Cir. 1982) (crewmember's presence on a vessel carrying large quantities of marihuana together with reasonable inferences, supported the conviction notwithstanding defendant's contention that he was a mere passenger).

Although Appellants argue that the evidence was also consistent with their defense that they were on the vessel taking a ride to Puerto Rico with the sole intention of illegally entering the United States, it was up to the jury to believe or disbelieve their defense. The jury did not believe it and we cannot second-guess that determination. See Trinidad-Acosta, 773 F.3d at 310-11. "Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence."[7] Id. at 311 (quoting Troy, 583 F.3d at 24). Thus, the district court properly denied Appellants' motions for judgment of acquittal.

## C. Government's Statements

According to Appellants, the prosecutor made some improper remarks during trial that deprived them of a fair trial.

---

[7] Although we have held that where the evidence is equally or nearly equally consistent with innocence as it is with guilt, "a reasonable jury must necessarily entertain a reasonable doubt," O'Laughlin v. O'Brien, 568 F.3d 287, 301 (1st Cir. 2009) (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)), that is not the case here, where the evidence establishing guilt was very strong.

Some of these remarks were objected to by some appellants at trial, while others were not.  We discuss each in turn.

This court reviews de novo whether objected-to remarks by the prosecution were improper and/or constituted misconduct.  See United States v. Sepúlveda-Hernández, 752 F.3d 22, 31 (1st Cir. 2014); United States v. Appolon, 695 F.3d 44, 66 (1st Cir. 2012). If we conclude that statements were improper or constituted misconduct, we must then determine whether such statements resulted in prejudice to the Appellants.  United States v. Rodríguez, 675 F.3d 48, 62 (1st Cir. 2012); United States v. Azubike, 504 F.3d 30, 38-39 (1st Cir. 2007); United States v. Joyner, 191 F.3d 47, 53 (1st Cir. 1999) ("[W]e review for harmless error, that is, whether the argument was 'sufficiently prejudicial to warrant a new trial under the circumstances'" (quoting United States v. Rosales, 19 F.3d 763, 767 (1st Cir. 1994))).  In determining whether the prosecutor's remarks were harmless, "we evaluate the . . . comments as a whole, not in isolation," Joyner, 191 F.3d at 53 (quoting Rosales, 19 F.3d at 767), and "we focus on (1) the severity of the misconduct, including whether it was isolated and/or deliberate; (2) whether curative instructions were given; and (3) the strength of the evidence against the [Appellants]."  United States v. González-Pérez, 778 F.3d 3, 19 (1st Cir. 2015) (citing Rodríguez, 675 F.3d at 62).  The prosecutor's improper statements "are considered harmful if they 'so poisoned the well that the trial's

outcome was likely affected, thus warranting a new trial.'"  Id. (quoting Rodríquez, 675 F.3d at 62).

Any unpreserved claims of prosecutorial misconduct are reviewed for plain error.  Id.; Rodríquez, 675 F.3d at 64 (requiring defendant to prove there was an error, which was clear or obvious, that affected his substantial rights, and seriously impaired the fairness, integrity, or public reputation of the judicial proceedings).

### 1.  Opening Statement

During her opening statement, the prosecutor stated:

> You'll hear the Judge inform you that jurisdictional aspects is not an issue for you to determine.  It's already been determined by this Court that the United States had jurisdiction over this vessel and that these individuals were on board this vessel which we had jurisdiction over with the intent and knowledge to possess and distribute the narcotics.
> Now, in this case there are no --

Peña-Santo's defense counsel immediately objected to the statement saying, "I object to that, Your Honor.  That's not what the Court determined.  That they knew that there were drugs on board is something for the jury.  That's an issue of fact for the jury to decide."  Gil-Martínez's counsel joined his objection and added that the district court's "ruling was regarding the jurisdiction, not that there were drugs inside the vessel."  Faced with these objections, the prosecutor responded, "I don't believe I stated

-23-

that. You will have to determine whether those drugs were on board, and you'll see the video of them throwing them overboard."

Because only Peña-Santo and Gil-Martínez preserved this argument, our review of their claim is for harmlessness. While our review of Vicente-Arias and Liriano's claim would ordinarily be for plain error, because Appellants' claim fails under both standards of review, we limit our discussion to the more defendant-friendly standard.

The prosecutor's statement gave the impression that the court had already determined that Appellants had the "intent and knowledge to possess and distribute the narcotics," which was not correct and, thus, was improper. However, we still need to determine whether the statement was prejudicial.

A review of the record does not reveal that the prosecutor intended to mislead the jury. Rather, it suggests that she simply misspoke when trying to list a series of issues the government wanted to address as an introduction to the government's case. Furthermore, the prosecutor's improper statement was isolated and not deliberate. See González-Pérez, 778 F.3d at 19. Defense counsel for Gil-Martínez and Peña-Santo immediately objected to the statement and, although the district court made no comment or ruling after the objection, the prosecutor immediately retracted the statement by saying: "I don't believe I stated that.

-24-

You will have to determine whether those drugs were on board, and you'll see the video of them throwing them overboard."[8]

Also, while the district court did not give a curative instruction at the time, we note that one was not requested. Moreover, the district court repeatedly instructed the jury that attorneys' arguments were not evidence. During the preliminary instructions, the court stated, "[r]emember these are arguments. It's what the Government intends to prove in the case. It's not the actual evidence. The actual evidence will be coming in after the witnesses start coming in and presenting exhibits." Then, during the final jury instructions, the district court reiterated that it was the government who had to prove intent beyond a reasonable doubt. Specifically, it stated, "[f]or you to find a defendant guilty of this crime, you must be convinced that the Government has proven each of these things beyond a reasonable doubt . . . that the defendants agreed to import cocaine and heroin . . . [and] did so knowingly and intentionally." This militates against finding prejudice. See United States v. Gentles, 619 F.3d

---

[8]   We note that the correction itself is problematic because it suggested that the video showed the defendants throwing packages overboard, whereas it was agreed that the defendants could not be identified as doing so from the video. No contemporaneous objection was made, so we review for plain error. As with the government's initial statement, the inaccurate reference in the correction does not amount to plain error, particularly given the admission in the testimony of the government's witness Agent Perry, that the defendants could not be identified in the video as throwing the packages overboard.

75, 82 (1st Cir. 2010) ("finding no error where defendant failed to request a curative instruction and court gave general instructions before deliberation as to what the jury could and could not consider as evidence" (citing United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007))); see also González-Pérez, 778 F.3d at 21 ("[W]e ordinarily presume that juries follow instructions.").

Finally, we find it unlikely that any prejudice surviving the instructions could have affected the outcome of the case. The evidence of Appellants' guilt was strong enough to prevent any prejudice surviving the instructions from affecting the outcome of the case. In addition, the fact that this statement was made at the beginning of the trial also makes it less likely to have affected the outcome of the case. See United States v. Mooney, 315 F.3d 54, 60 (1st Cir. 2002) ("The context of the prosecutor's comments also weighs against finding that they likely affected the outcome of the trial. The comments occurred during opening arguments, not during summation where the last words the jury hears have significant potential to cause prejudice."). In sum, because we do not find that the prosecutor's statement "so poisoned the well that the trial's outcome was likely affected," González-Pérez, 778 F.3d at 19 (quoting Rodríguez, 675 F.3d at 62) (internal quotation marks omitted), Appellants' claim fails.

## 2.  Redirect Examination

On direct examination, Ms. Cacho, the chemist, testified about the tests she performed on some of the drugs in order to conclude that they were heroin and cocaine.   During cross-examination, Gil-Martínez's defense counsel asked Ms. Cacho whether she knew if other tests -- such as fingerprint analysis and DNA testing -- had been performed on the packages containing the drugs.  Defense counsel's point was that no tests linked the Appellants to the drugs.  Ms. Cacho testified that she did not do anything other than analyze the chemical composition of the substances.   On redirect examination, the prosecutor asked Ms. Cacho, "Did you watch the video of the defendants throwing the drugs into the water?"  Gil-Martínez's defense counsel objected and stated that "[t]hat was not part of the cross-examination."  The district court allowed the question, to which Ms. Cacho responded, "No."

Although they did not object at trial to the prosecutor's question to Ms. Cacho on redirect examination, Peña-Santo and Vicente-Arias now argue that it was a "loaded" and "speaking question" that aimed to confuse the jury by making them believe that there was direct evidence linking them to the crimes charged. They allege that, because there was no direct evidence or witness identifying them as throwing anything into the water and no one

-27-

could tell from the video whether they were the ones throwing the drugs overboard, they are entitled to a new trial.

Since Peña-Santo and Vicente-Arias failed to object to the question at the trial level, our review is only for plain error.[9]  Their claim falls short because, at the very least, they failed to establish plain-error review's third and fourth prongs. Specifically, Peña-Santo and Vicente-Arias have not shown that their substantial rights were affected and that the fairness, integrity, or public reputation of their judicial proceedings were seriously impaired, especially because Ms. Cacho responded to the question in the negative.  Although they argue that the question wrongly gave the impression that direct evidence (the video) showed them throwing the drugs overboard, the fact that Ms. Cacho responded that she had not seen the video -- coupled with the fact that the jury examined the evidence (including the video) from which the government could lawfully suggest that the jury draw an inference that Appellants were the ones throwing the drugs overboard[10] -- sufficiently attenuated any effect that the question

---

[9]  We note that only Gil-Martínez objected to the prosecutor's question at the trial level, but he did so on different grounds -- that the question went beyond the scope of the cross-examination -- and neither Peña-Santo nor Vicente-Arias joined his objection.

[10]  The government may suggest to the jury which inferences should be drawn from the evidence as long as the government does not know that the suggested inferences are false or has very strong reasons to doubt those inferences.  See United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011) (stating that "[a]lthough it is the jury's job to draw the inferences, there is nothing improper in the

alone could have had.  This is just not the kind of "blockbuster error" for which "plain error review tends to afford relief." Rodríguez, 675 F.3d at 64.

### 3. Closing Argument

Peña-Soto and Vicente-Arias also challenge the following statement made by the government during its closing argument: "That's not someone's personal drug stash right there.  $3.2 million is not something that the four of them are going to use casually at parties.  Those are drugs that the four of them are going to sell at a profit, $3.2 million."  Although they did not object to the statement at the trial level, Peña-Santo and Vicente-Arias assert that it satisfies the plain error standard of review since there was no evidence, either circumstantial or direct, that they intended to sell drugs for profit or that they stood to gain millions of dollars in profit.  Relying on Arrieta-Agressot v. United States, 3 F.3d 525, 527 (1st Cir. 1993), they claim that the challenged statement was inflammatory by referring to money and wealth, and that the evidence showed, at most, that they acted as couriers (mules) or may have assisted on the boat.  We disagree.

Although there was no direct evidence that Appellants intended to sell the drugs for profit, there is no error -- plain

Government's suggesting which inferences should be drawn," but noting that it is error for the government to propound inferences that it knows to be false, or has a very strong reason to doubt) (citations omitted).

or otherwise -- in referencing the amount or worth of the drugs and inviting the jury to draw the inference that the drugs were not for personal use. See United States v. Bergodere, 40 F.3d 512, 518 (1st Cir. 1994) (noting that "we have long recognized that factors such as the quantity and purity of the drugs confiscated by the authorities can support an inference of intent to distribute"); see also United States v. Meadows, 571 F.3d 131, 144-45 (1st Cir. 2009) (At closing argument, the prosecution may "ask jurors to draw reasonable inferences from the evidence."). And, even if the Appellants would not be the ones actually to sell the drugs and were instead couriers or mules, they were still part of the same conspiracy to import and distribute (and eventually sell for profit) controlled substances, which were the charged offenses. Furthermore, Peña-Santo's and Vicente's reliance on Arrieta-Agressot is misplaced. The improper comments in Arrieta-Agressot had to do with the "evil" effect that the defendants' actions had on society. There, we established that a prosecutor's statement is improper if it serves no purpose besides inflaming the passions and prejudices of the jury. 3 F.3d at 527. Here, however, the prosecutor's reference to the worth of the drugs had the legitimate purpose of both refuting the Appellants' mere presence defense and suggesting that the jury draw an inference as to the required element of intent. See Bergodere, 40 F.3d at 518. Thus, their plain error claim fails.

## D.  Peña-Santo's Cumulative Error Claim

Peña-Santo argues that if none of his previous claims of error is sufficient to vacate his conviction, their cumulative prejudicial effect requires that his conviction be vacated and his case remanded for a new trial.

We have acknowledged that "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect."  United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).  "[C]laims under the cumulative error doctrine are sui generis."  Id. at 1196.  When reviewing such a claim a Court must consider:

> each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of [] errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy -- or lack of efficacy -- of any remedial efforts); and the strength of the government's case.

Id.  In addition, the length of the trial is another factor to be considered.  Id.

Here, none of Peña-Santo's alleged errors -- which are not many, considering the length of the trial -- resulted in substantial prejudice and most of them are entirely without merit. Furthermore, as previously explained, the evidence against Peña-Santo was very strong, and the district court did not conduct the trial in a manner that undermined his right to a fair trial.  Thus,

-31-

we reject his contention that his conviction was tainted by cumulative error. See United States v. Flemmi, 402 F.3d 79, 95 n.23 (1st Cir. 2005) ("[B]ecause we have found that none of [the defendant's] individual complaints resulted in substantial prejudice and that most are completely without merit, we reject the final contention that his conviction was tainted by cumulative error." (quoting United States v. DeMasi, 40 F.3d 1306, 1322 (1st Cir. 1994))). "The Constitution entitles a criminal defendant to a fair trial, not to a mistake-free trial." Sepúlveda, 15 F.3d at 1196 (citing Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)); United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988)).

**E. Gil-Martínez's Sentencing Disparity Claim**

Gil-Martínez claims that he received a disparately higher sentence than co-defendant Vicente-Arias, even though there was no evidence of dissimilar conduct among them and they both had the same Criminal History Category ("CHC").

**1. Background**

The Presentence Investigation Report ("PSR") recommended a Guidelines sentencing range ("GSR") for Gil-Martínez of 235 to 297 months of imprisonment.[11] The PSR did not identify any

---

[11] Pursuant to U.S. Sentencing Guidelines Manual § 3D1.2(d) (2004) ("U.S.S.G."), Counts One and Two were grouped together. These offenses resulted in a base offense level of thirty-eight, pursuant to U.S.S.G. § 2D1.1. Gil-Martínez had no previous criminal history and had a CHC of I. This yielded a GSR of 235 to 297 months of imprisonment.

information that would warrant a role adjustment or a departure. At the sentencing hearing, the district court considered the PSR's recommended GSR and took into account Gil-Martínez's "unfortunate rearing and upbringing."  It considered that at times Gil-Martínez was unable to eat because his family could not afford food, he lived in a wooden house with a dirt floor, and he only had a fourth grade education because he left school at a young age to help support his family.  Gil-Martínez argued that a within-the-Guidelines sentence would be unreasonable when compared to Vicente-Arias's sentence of 130 months of imprisonment.  He then requested to be sentenced to 120 months of imprisonment, the statutory minimum.  He argued that sentencing him to a greater term of imprisonment would create a sentencing disparity.

The district court considered Gil-Martínez's request for a sentence similar to that of Vicente-Arias, who received a minor role reduction.  The government opposed Gil-Martínez's request for a downwardly variant sentence of 120 months, arguing that, while Vicente-Arias had received a minor role reduction, Gil-Martínez had a number of roles onboard the yola, which distinguished him from Vicente-Arias.  The government pointed out that Gil-Martínez had admitted to operating and fueling the yola.  The district court concluded that it did not have any information that would support granting Gil-Martínez a minor role reduction like that Vicente-Arias received or otherwise sentencing him to a term of

imprisonment the same as or similar to that of Vicente-Arias. The court also considered the sentences imposed on other co-defendants. It noted that, although Peña-Santo received the statutory minimum sentence of 120 months of imprisonment, Peña-Santo's characteristics were different from those of Gil-Martínez because Peña-Santo was facing serious health conditions and his life expectancy was less than six months. The district court noted that although Gil-Martínez compared himself only to Vicente-Arias and Peña-Santo, the district court had also sentenced another co-defendant who had pleaded guilty pursuant to a straight plea to 188 months of imprisonment. The district court then stated that, in sentencing each defendant, it had taken into consideration "the particular situation of each and every one defendant" and had "individualized sentencing." After concluding that the court did not have any information to support a minor role reduction, and that Gil-Martínez was in good health, the district court imposed on Gil-Martínez a downwardly variant sentence of 192 months of imprisonment.

### 2. Standard / Scope of Review

We review challenges to the reasonableness of a sentence "under a deferential abuse-of-discretion standard." Gall v. United States, 552 U.S. 38, 41 (2007). We first consider "whether the district court made any procedural errors, such as 'failing to calculate (or improperly calculating) the Guidelines range,

treating the Guidelines as mandatory, failing to consider the section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range.'" United States v. Maisonet-González, 785 F.3d 757, 762 (1st Cir. 2015) (quoting United States v. Rivera-Moreno, 613 F.3d 1, 8 (1st Cir. 2010)).  If the district court has committed no procedural error, we then review the substantive reasonableness of the sentence imposed for abuse of discretion. United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013). "When conducting this review, we take into account the totality of the circumstances, including the extent of any variance from the Guidelines." Maisonet-González, 785 F.3d at 762 (quoting Trinidad-Acosta, 773 F.3d at 309).  "A sentence will withstand a substantive reasonableness challenge so long as there is 'a plausible sentencing rationale and a defensible result.'"  Id. (quoting United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008)).

In fashioning a sentence, judges must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6). Although this provision is primarily aimed at national disparities, rather than those between co-defendants, Martin, 520 F.3d at 94, we have also held that if "'identically situated defendants' receive significantly disparate sentences, red

flags may indeed be raised." United States v. Rivera-López, 736 F.3d 633, 636 (1st Cir. 2013) (quoting United States v. Mueffelman, 470 F.3d 33, 41 (1st Cir. 2006)).

### 3. Analysis

We afford the district court wide discretion in sentencing because, after the court has calculated the GSR, "sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." United States v. Politano, 522 F.3d 69, 73 (1st Cir. 2008) (quoting Martin, 520 F.3d at 92). Gil-Martínez does not allege that the district court failed to consider the 18 U.S.C. § 3553(a) sentencing factors -- including the need to avoid sentencing disparities -- or commit any other procedural error. Rather, his challenge goes to the weighing of the section 3553(a) sentencing factors, specifically the factors establishing the need to avoid sentencing disparities and the history and characteristics of the defendant. As Gil-Martínez was sentenced below the applicable GSR, his challenge to the substantive reasonableness of his sentence faces an uphill battle. See United States v. Joubert, 778 F.3d 247, 256 (1st Cir. 2015) ("When, as in this case, a district court essays a substantial downward variance from a properly calculated guideline sentencing range, a defendant's claim of substantive unreasonableness will

generally fail." (quoting United States v. Floyd, 740 F.3d 22, 39-40 (1st Cir. 2014))).

As the Government correctly contends, a district court's consideration of sentencing disparity aims primarily at the minimization of disparities among defendants nationally and, while avoidance of disparities among co-defendants may be considered, "a defendant is not entitled to a lighter sentence merely because his co-defendants received lighter sentences." United States v. Wallace, 573 F.3d 82, 97 (1st Cir. 2009) (quoting United States v. Marceau, 554 F.3d 24, 33 (1st Cir. 2009)). Furthermore, contrary to Gil-Martínez's claim, he is not entitled to the same sentence as Vicente-Arias because they are not "identically situated," inasmuch as Vicente-Arias received a minor role reduction[12] and Gil-Martínez did not. See Rivera-López, 736 F.3d at 636; United States v. Rivera-González, 626 F.3d 639, 648 (1st Cir. 2010). At the sentencing hearing the district court stated that it would not grant Gil-Martínez a minor role reduction because it did not have any information supporting a minor role reduction, and, as the government argued, the information was to the contrary, with Gil-Martínez having admitted to operating and fueling the yola. The district court concluded that this information distinguished Gil-Martínez's role in the conspiracy from that of Vicente-Arias. Gil-Martínez has failed to show that these findings of fact

_____

[12]  This resulted in Vicente-Arias having a lower GSR.

regarding his role in the conspiracy were clearly erroneous. See United States v. Torres-Landrúa, 783 F.3d 58, 66 n.10 (1st Cir. 2015). In addition, although Gil-Martínez selectively compares himself only to Vicente-Arias, the record shows that the district court did take into consideration the need to avoid sentencing disparities not only in relation to Vicente-Arias, but also in relation to his other co-defendants. It is clear from the record that the district court also took into consideration that another co-defendant, who had pleaded guilty pursuant to a straight plea, had received a sentence of 188 months of imprisonment, and that Peña-Santo, who was sentenced to the statutory minimum, received that sentence because he was sick and his life expectancy was less than six months. Because it is evident that the district court did consider the need to avoid sentencing disparities among defendants, as well as the other sentencing factors, sufficiently explained its chosen sentence, and arrived at a defensible result, Maisonet-González, 785 F.3d at 762, Gil-Martínez's challenge to the reasonableness of his downwardly variant sentence fails.

### III.  Conclusion

The record reflects that Appellants were afforded a fair trial, that the expert testimony of Agent Conchin was proper, and the evidence of their guilt was more than sufficient to support the jury's verdicts. In addition, the record shows that Gil-Martínez's

sentence was appropriate.  Thus, Appellants' convictions and Gil-Martínez's sentence are affirmed.

**<u>Affirmed</u>**.